Nott, J.,
delivered tbe opinion of tbe court:
This is an action brought to recover $28,723, tbe net proceeds, as is alleged, of one hundred and fifteen bales of cotton captured in Louisiana in tbe spring of 1863.
Tbe evidence in this case is confusing rather than conflicting. There have been twenty-eight witnesses examined on tbe part of tbe claimant; be also offers in evidence a large number of receipts, certificates and official reports; and tbe briefs of bis counsel contain over forty pages of printed matter. Many of tbe facts and circumstances sought to be established could only be established from tbe nature of things by indirect or circumstantial evidence; and it has also been a matter of doubt into which of several parcels of captured property tbe claimant’s cotton went, and what was tbe amount of tbe proceeds derived from it.
A number of objections to entire depositions, and to parts of tbe testimony, have also been taken and elaborately argued by tbe special counsel of .the Treasury, who appears in these case’s for tbe defence. As preliminary to tbe consideration of tbe case, we have considered these objections and have ruled all of them in favor of tbe defendants, except those to tbe testimony of tbe vendors and one other. That one is tbe objection to tbe certificate of Captain James Alden, tbe commander of tbe Bichmond. This certificate, given to tbe claimant at the time of bis discharge as pilot of tbe Bichmond by tbe commander of that vessel, we regard as in tbe nature of an honorable discharge. We think that a person in tbe public service during a portion of tbe war is entitled to show by an honorable discharge from bis commanding officer that for that length of time, at least, be served bis country faithfully and well. We admit tbe certificate to that extent and for that purpose.
From tbe evidence admitted it appears that after tbe spring of 1862, tbe claimant was a person of unquestionable loyalty, and, indeed, one who rendered to tbe government services • *374 involving great personal risk and daring. Of bim. Vice-Admi-xniral Porter testifies:
“I was acquainted with, him during the war. He served faithfully as a pilot in one of Admiral Farragut’s vessels during all the operations of that officer in the river Mississippi, after he reached New Orleans, in front of Vicksburg, &c., in 1862. I am quite certain of his having performed his duty to the satisfaction of all who were connected with him. I never heard of his expressing disloyal sentiments or doing anything of a disloyal nature.
“The service that he performed was of a dangerous character. He ran the risk of his life like others on board, and piloted his ship under heavy fire.
‘¿During the time I was before Vicksburg, in 1863, co-operating with General Grant, Mr. Ealer was employed constantly as a government pilot. He was so employed during the siege of .that place.
“Mr. Ealer stood fair with everyone; performed his duty well, and was considered a good Union man.”
And the Vice-Admiral adds, upon cross-examination, “Mr. Ealer was much more willing and anxious to serve the government than any other pilot. In fact, he was the only one that I know of who did it with a good grace.” The claimant also holds the certificates of Admiral Farragut and General Sherman. He has, moreover, spread before us, by abundant testimony, his whole life after the 1st June, 1862.
Before the 1st June, 1862, the evidence is not so clear.' In his duly verified petition he tells us:
“That he was born in Allentown, Pennsylvania; that for more than twenty-five years he has been employed as a steamboat pilot, running usually between the cities of New Orleans and St. Louis. That in 1858 he removed to New Orleans, and at the outbreak of the rebellion, and when the blockade took place, was employed on the steamer Clara Dolson, running between St. Louis and New Orleans, and which being at New Orleans was detained there and laid up.
“That in the fall of 1861, petitioner went on the Alonzo Childs, making four trips to Memphis and back, and in the winter and spring of 1861-’62 on the steamer National, limning between New Orleans and Memphis. That in his employment as aforesaid, and in business transactions, he was com *375 pelled to receive Confederate currency, of which, he had a considerable sum in his possession, and having no confidence in its value.
“ Petitioner further represents that about the 10th of May, 1862, he left the National, then lying at Memphis, and proceeded to Opelousas, Louisiana, where he had a brother named Charles N. Baler, residing, and placed in the hands of his said brother his money aforesaid, with instructions to invest the same for him in cotton, on the best terms he could, and to hold the same for petitioner’s account. Petitioner further states that on the 30th of May he went to a little town called Washington, on Bayou Catobleau, and, in company with a Mr. Block, hired a skiff in which they ivent to Indian village, at' the mouth of Bayou Plaquemine, and there procured a buggy and traveled in it to the town of Plaquemine, about one hundred and ten miles distant from New Orleans by water, there procured another skiff, and in it went down the Mississippi to New Orleans, arriving there about the 3d of June, 1862, the city then being in occupation by the United States forces.”
And in confirmation of these averments, it does appear that about the beginning of the rebellion the claimant removed his family from New Orleans to St. Louis; that after the outbreak of the rebellion boats seeking to ascend the river above Memphis were turned back; that on the 10th May, 1862, the claimant was within the Confederate lines a.t Memphis; that on the 26th May he reached Opelousas, in the State of Louisiana; that soon after this he left Opelousas for Washington, Louisiana, and that about the 1st June he was in New' Orleans.
Taking all of these facts into consideration, and especially his excellent record after reaching the United States lines, we think that the claimant has established his loyalty, and that his residence within the insurrectionary district was not a voluntary one.
It has been the settled doctrine of this court that voluntary residence, north or south, implied loyalty or disloyalty, and the doctrine of this court is now made the law of the land. The Act 25th June, 1868, (15 Stat. L., c. 71, § 3,) expressly declares that ‘‘the voluntary residence of any such person in any place where, at any time during such residence, the rebel force or organization held sway, shall bejprima facie evidence that such person did give aid and comfort to said rebellion.” The claim *376 ant, therefore, is entitled to the benefit of the presumption which the fact of invohmtary residence would give him,.
The quantity of cotton captured is shown by the receipts of the quartermaster who made the seizure, and also by his testimony, to be one hundred and eight bales; but the amount of the net proceeds does not so clearly appear. The captured cotton in the “Department of the Gulf” seems to have fallen into three parcels. The first came to the Treasury by being turned over to the agents of the Treasury in New York; the second by being turned over to the agents of the Treasury in Boston; the third by being sold in New Orleans by the quartermaster of the department, and the proceeds carried from his account to that of the “ captured and abandoned property fund,” by the Treasury. The manner in which this last transfer was effected was examined by the court in Rudnal’s Case, (3 C. Cls. R., p. 291,) and found sufficient to sustain a similar action.
The claimant having failed to show into which of these three parcels his cotton went, his counsel insists that inasmuch as the defendants, into whose hands the cotton came, have mingled it with the cotton of other persons, the proper and legal way to ascertain the “net proceeds” is to take the average .of the proceeds derived from all the sales; and he cites Mott’s Case, (3 C. Cls. B., p. 363,) to show that “where a loyal claimant, under the, 'Abandoned or captured property act,’ traces his cotton into the possession of the proper agents of the Treasury, and it appears there to have been mingled with other cotton, so that the ‘net proceeds’ cannot be precisely ascertained, he will recover the average of the ‘net proceeds’ of all the cotton so intermingled.”
The rule laid down in Mott’s Oase Ave still leave unquestioned; but the trouble in this case is that the claimant has not “traced his cotton into the possession of the proper agents of the Treasury,” and it is only by relying upon this sale by the quartermaster that we can infer that his cotton came into the Treasury. The parcels sold by the agents in Nerv York and Boston brought larger proceeds than the parcel sold by the quartermaster in NeAv Orleans. It cannot be implied in favor of the party Avhose duty it is to prove the fact, that his captured property was taken from a parcel which sold at a low price' and intermingled with a jiarcel that sold at a high price. The court must leave this cotton where the evidence leaves it, viz: with the quar- *377 ' termaster at New Orleans, into whose bands it came. And the only relief which we feel warranted'to give is “the average of the not proceeds of all the cotton” so sold at New Orleans. This average we find was one hundred and ninety-two dollars a bale. The claimant will, therefore, recover that amount for one hundred and eight hales.
The judgment of the court is that the claimant recover of the defendants the sum of twenty thousand seven hundred and thirty six dollars, ($20,736.)
Casey, Oh. J., dissented on the facts, but concurred in the judgment rendered under a different construction of the statutes..
Peck, J., dissented on the facts.